Tory E. Griffin (SBN 186181)
REYNOLDS TILBURY WOODWARD LLP
11601 Blocker Drive, Suite 105
Auburn, CA 95603
Telephone: (530) 885-8500
Facsimile: (530) 885-8113
Email: tgriffin@rtwlawllp.com

Attorneys for Plaintiff Laura Burns

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA BURNS,<br><br>          Plaintiffs,<br><br>    v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, a Delaware corporation,<br><br>          Defendants. | Case No.:<br><br>**COMPLAINT UNDER 28 U.S.C. § 7434 – FRAUDULENT FILING OF INFORMATION RETURN** |

Plaintiff Laura Burns hereby complains and alleges as follows (the "Claim"):

### INTRODUCTION

1.    Plaintiff Laura Burns ("Ms. Burns" or "Plaintiff") brings this action under 28 U.S.C. § 7434 for damages against Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch" or "Defendant"). Merrill Lynch issued a false information return, namely a federal Form 1099, to Plaintiff in the amount of $1,397,293.92, and refused to issue an amended 1099 when notified of the error.

/ / /

/ / /

1

COMPLAINT FOR DAMAGES

**JURISDICTION**

2.    This court has federal subject matter jurisdiction to hear this matter under 28 U.S.C. § 1331 because the cause of action is based on a violation of federal law, namely a violation of 28 U.S.C. § 7434.

3.    Venue here is proper under 28 U.S.C. § 1391(b)(1) because Merrill Lynch resides in this district (see § 1391(d)) and is also proper under § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district.

**PARTIES**

4.    Plaintiff Laura Burns is an individual who resides in Placer County, California.

5.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation, which is qualified to and does business in the state of California and, specifically, the Eastern District of California.

6.    Wayne Rowlands is a former long time employee of Defendant and also the former romantic partner of Plaintiff.  He passed away on May 29, 2020.

**FACTS**

7.    After previously being employed by Merrill Lynch for 26 years, Mr. Wayne Rowlands returned to Merrill Lynch's employ as a Senior Vice President – Wealth Management in October 2016.

8.    Under Mr. Rowlands' employment agreement with Merrill Lynch, Merrill Lynch agreed to pay Mr. Rowlands $21,171.12 per month from February 2017 through October 2025. The employment agreement further provided that in the event of Mr. Rowlands' death, Merrill Lynch would pay his estate a lump sum equal to the remaining compensation payments due to Mr. Rowlands through October 2025, less any outstanding debts Mr. Rowlands owed to Merrill Lynch.

9.    At the same time Mr. Rowlands re-commenced his employment with Merrill Lynch in February 2017, Mr. Rowlands signed a promissory note with Merrill

Lynch for over two million dollars, to be repaid over a 10-year period at the rate of $21,171.12 per month from February 2017 through October 2025.

10.    Mr. Rowlands was the only signatory on the note. Mr. Rowlands, a resident of California, was not married when he executed the promissory note.

11.    Mr. Rowlands passed away in May 2020.

12.    At the time of his death, Mr. Rowlands still owed $1,627,234.55 on the promissory note with Merrill Lynch.  Per the terms of Mr. Rowlands' Employment Agreement with Merrill Lynch, he was owed compensation payments through October 2025 totaling $1,397,293.92.  Merrill Lynch credited these payments due to Mr. Rowlands against the amounts remaining due under the promissory note. The resulting remaining balance on the note was $229,940.63.

13.    Though Ms. Burns was Mr. Rowlands' romantic partner and had invested her personal funds with Merrill Lynch under his management and Merrill Lynch's supervision, Ms. Burns and Mr. Rowlands were never married.

14.    Ms. Burns is not a signatory on the promissory note signed by Mr. Rowlands with Merrill Lynch.  She did not personally guarantee repayment of the amounts due under that note.  She never assumed any debt as to this note.

15.    Given that Ms. Burn's never incurred any debt under the promissory note, neither the income to Mr. Rowlands nor the forgiveness of debt by Merrill Lynch was income to Ms. Burns.  If anything, it was income to Mr. Rowlands or to his estate.

16.    On March 22, 2021, Merrill Lynch, through counsel, sent Ms. Burns a letter explaining the terms of Mr. Rowlands' employment agreement, and attaching a copy of the promissory note and employment agreement. (See Exhibit A.)

17.    In 2022, Merrill Lynch issued a Form 1099 for the year 2021 to Ms. Burns *personally* in the amount of $1,397.293.92, which is the amount Merrill Lynch owed to Mr. Rowlands under the employment agreement at the time of Mr. Rowlands death.  (See Exhibit B [redacted to protect private information].) Merrill Lynch should

COMPLAINT FOR DAMAGES

have issued the 1099 to Mr. Rowlands' estate, not Ms. Burns personally.

18.    Ms. Burns, through counsel, notified Merrill Lynch in writing that Merrill Lynch had issued a false and improper 1099 to Ms. Burns personally, as Ms. Burns did not personally receive any of the income due to Mr. Rowlands and was not obligated under the promissory note either as a signatory, personal guarantor, or on the theory of a community debt (as she and Mr. Rowlands were never married). Ms. Burns therefore demanded that Merrill Lynch immediately correct its error by (1) withdrawing the 1099, or (2) amending the 1099 to reflect the amount of $0 to Ms. Burns, or (3) amending the 1099 to change the Recipient of the 1099 to Wayne Rowlands. (See Exhibit C.)

19.    Ms. Burns received no response from Merrill Lynch.  No withdrawal of the 1099 or correction to its error was ever made.

20.    Because the income of forgiveness of debt falsely reported on the 1099 to Ms. Burns is a taxable event, it has caused Ms. Burns considerable hardship.  She was forced to file for an extension on her taxes for 2021. Ms. Burns has no means nor ability to pay the tax liability for this event.

21.    Unfortunately Merrill Lynch's false 1099 appears to be retaliatory for Ms. Burns seeking to arbitrate claims against Merrill Lynch – claims that relate to Mr. Rowland's theft of her money while he was in Merrill Lynch's employ.  (See Exhibit D.)  Mr. Rowlands, acting as Merrill Lynch's advisor responsible for overseeing and managing Ms. Burns' funds, used his position as the account representative to make unauthorized withdrawals and sales on Ms. Burns' account for his own personal gain and benefit, ultimately depleting that account.

### FIRST CLAIM FOR RELIEF

False/Fraudulent Filing of Form-1099 (26 U.S.C. § 7434)

22.    Plaintiff incorporates paragraphs 1-21 above as though fully set forth herein.

4

COMPLAINT FOR DAMAGES

23.    26 U.S.C. § 7434(a) provides: "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." A Form 1099 for income is an "information return" within the meaning of 26 U.S.C. § 7434(a).  (See 26 U.S.C. § 6724(d)(1)(A) and 26 U.S.C. § 6041(a).)

24.    The 1099 filed by the defendant was fraudulent because it named Plaintiff as the recipient of income as the result of Mr. Rowlands' employment agreement and promissory note with Merrill Lynch, even though Ms. Burns was not married to Mr. Rowlands and was not obligated on Mr. Rowlands' debt to Merrill Lynch.

25.    Under 26 U.S.C. § 7434(a), Merrill Lynch is liable for Plaintiff's actual damages or $5,000, whichever is greater. Plaintiff's actual damages to date are unknown given her filing of an extension of her 2021 taxes. If she has to contest the fraudulent 1099 with the IRS in relation to the filing of her tax return or is somehow found obligated to pay taxes on the reported amount, Plaintiff's damages potentially range in the hundreds of thousands of dollars.

26.    Plaintiff also incurred costs attributable to resolve the deficiency asserted as a result of the defendant's filing, costs of this action, and attorneys' fees.

27.    Plaintiff's damages all were the proximate result of the fraudulent filing by the Defendant.

28.    Plaintiff has provided a copy of this Complaint to the IRS as required by 28 U.S.C. 26 U.S.C. § 7434(c).

### PRAYER

Based on the foregoing, Plaintiff prays for judgment as follows:

1.    Damages in favor of plaintiff and against defendant in an amount to be determined by the court, but in no event less than $5,000, plus interest.

2.    A Mandatory injunction or other order requiring Merrill Lynch to withdraw its 1099 against Laura Burns or, in the alternative, amend the 1099 for an income amount of "$0."

3.    An order or finding under 26 U.S.C. § 7434(e) declaring that Plaintiff is not the legal recipient of any income paid by Defendant to Wayne Rowlands, or income related to of Wayne Rowlands' debt forgiven by Defendant.

4.    Attorneys' fees and costs as provided by law, including 28 U.S.C. § 7434(b); and

5.    Such other and further relief to the Plaintiff as the Court deems just and proper.

DATED:  May 2, 2022                REYNOLDS TILBURY WOODWARD LLP


By:_____
                TORY E. GRIFFIN
                Attorneys for Plaintiff
                Laura Burns

COMPLAINT FOR DAMAGES

EXHIBIT A

**RubinFortunato**

**KAREN MILNER**
DIRECT DIAL: (610) 408-2019
DIRECT FAX: (610) 854-1861
EMAIL: kmilner@rubinfortunato.com

March 22, 2021

**Via U.S. Mail**

Ms. Laura Burns
P.O. Box 427
Roseville, CA 95661

Re:   **Wayne Rowlands; Merrill Lynch Promissory Note**

Dear Ms. Burns:

This firm represents Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"). First, we want to express our sympathies regarding your loss.

We are writing concerning the terms of Mr. Rowlands' Merrill employment agreement dated October 21, 2016 ("Agreement"). **See** Exhibit 1. Pursuant to the terms of that Agreement, Merrill agreed to pay him monthly transition compensation payments of $21,171.12 from February 2017 through October 2025. In total, he received 39 payments of $21,171.12. The Agreement also provides that in the event Mr. Rowlands' employment is terminated by reason of death, Merrill will pay his Estate a lump sum equal to the remaining transition compensation payments, *less any outstanding debts he owed to Merrill.*

When Mr. Rowlands commenced employment with Merrill on October 21, 2016, he also executed a Promissory Note under the terms of which he agreed to repay $2,037,771 with interest at a rate of 2% to Merrill. **See** Exhibit 2. The Promissory Note provides that he would repay the sum of $21,171.12 on a monthly basis, beginning in February 2017 and continuing through October 2025. He repaid $756,886.26; the indebtedness remaining on that note is $1,627,234.55 (the "Note Balance").

There were 66 remaining transition compensation payments of $21,171.12, for a total of $1,397,293.92. Merrill will process the lump sum payment. After applicable withholdings are deducted, you will net approximately $1,397,293.92 in income, which will be applied against the Note Balance of $1,627,234.55. After this process has been completed, the remaining balance on the note will be approximately $229,940.63. Merrill has agreed to forgive that remaining note balance (estimated to be approximately $229,940.63), and will issue an IRS Form 1099-C (and/or other applicable tax form) for the 2021 tax year.

Rubin, Fortunato & Harbison P.C.

10 South Leopard Road, Paoli, Pennsylvania 19301 | 610.408.2000 | www.rubinfortunato.com

Please be advised that we do not represent you, nor are we providing you any legal or tax advice. We recommend that you consult with an attorney or a tax professional regarding any potential tax liability as a result of both the aforementioned transactions.

We again express our deepest sympathies to you.

Sincerely,

RUBIN, FORTUNATO & HARBISON P.C.

Karen Milner

cc:    Brandy Pairot (via Electronic Mail)

# EXHIBIT
## "1"

# AGREEMENT

This is an Agreement between MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED ("Merrill Lynch") and WAYNE ROWLANDS ("Rowlands").

Merrill Lynch and Rowlands agree to the following terms and conditions.

1.     Rowlands represents that he is a duly licensed registered representative in the securities industry. Rowlands represents that he has disclosed to Merrill Lynch all political contributions he made to a candidate or public official since March 14, 2011. Rowlands understands that this offer of employment is contingent upon completion of a review by Merrill Lynch required by the GWIM U.S. Political Contributions Policy. Rowlands understands and agrees that Merrill Lynch's offer of employment is also expressly conditioned upon the accuracy of the foregoing representations as well as all other information which Rowlands has provided including that relating to Rowlands's historical commission production and regulatory and disciplinary background.

2.     Rowlands represents that he desires to terminate his current employment in favor of employment at Merrill Lynch.

3.     Merrill Lynch therefore agrees to employ Rowlands and Rowlands accepts employment pursuant to the following terms:

    a.     Duties. Rowlands shall be employed as a Financial Advisor and shall devote his full time and effort to servicing the needs of Merrill Lynch's and/or Bank of America's investors and customers. (Merrill Lynch and its Bank of America affiliates are collectively referred to herein as the "Company"). Rowlands will at all times comply with Merrill Lynch's internal policies and procedures, as well as state and federal securities laws, and the rules of the various exchanges and other regulatory bodies to which Rowlands and Merrill Lynch are subject.

    b.     Certification and Registration Requirement.

        1.     Certification. Rowlands acknowledges that he has been directed by Merrill Lynch not to bring any documents from his prior employer. Consistent with those instructions Rowlands is not bringing any documents from his prior employer to Merrill Lynch. Rowlands understands that "documents" includes any memorialization of information that is proprietary to his prior employer, whether it is on a physical piece of paper or maintained

1
2:/10.20.2016 (2:08:03 pm)

electronically on a disk, a hard drive or otherwise. This provision will not preclude Rowlands from bringing information regarding only the client names, addresses, phone numbers, e-mail addresses and account titles of persons whom he served as a registered representative at his prior employer, but he is not permitted to take any other documents or information.

        2.     Registration Requirement. Rowlands understands that the State of California requires Investment Advisory Representative (IAR) registration and pursuant to Merrill Lynch policy, he must obtain and maintain a Series 7 registration, a Series 63 registration, AND a Series 65 registration (or its equivalent). Rowlands currently holds Series 7 and 63 registrations, and received a waiver from the State of California for his Series 65 (IAR) registration at his immediately prior firm. If a request to transfer Rowlands's Series 65 (IAR) registration waiver is not granted, Rowlands understands that he must, within his first 120 days of employment, obtain the Series 65 (IAR) registration (or its equivalent). Rowlands further understands that he will NOT be permitted to hold himself out as an Investment Advisor Representative or to conduct or be paid on (in arrears or otherwise) ANY business requiring IAR registration until he is approved as an Investment Advisor Representative in California.

        c.     Compensation. In consideration of the above services to be rendered by Rowlands and upon the representations of Rowlands concerning his past performance and compliance background; and upon the parties' recognition and acknowledgment of the value of continued employment, Merrill Lynch will compensate Rowlands as follows, and all payments hereunder will be subject to required withholding for federal, state and local taxes:

        i)     Monthly Transition Compensation. The transition compensation payments described in this paragraph are not eligible for computation of benefits (usually known as "non eligible compensation"):

        a)     Initial Transition Compensation. Unless the time periods noted herein are suspended and modified for a Leave of Absence (defined below), Rowlands shall be entitled to monthly transition compensation payments of Twenty-One Thousand One Hundred Seventy-One and 12/100 Dollars ($21,171.12) ("Transition Compensation") when incentive compensation is paid for the months of February 2017 through October 2025 ("End Date") (e.g. the transition compensation payment for the month of January will be reflected in the first paycheck Rowlands receives in February). If Merrill Lynch elects to suspend payment of Transition Compensation due to a Leave of Absence, the payments will resume as soon as

practicable after Rowlands returns to active employment, and the End Date described above will be extended by the number of months that the payments were suspended. "Leave of Absence" is a period of time during which Rowlands is on an approved leave of absence (as defined by the applicable leave of absence policies governing Rowlands's employment) for a period of 30 days or more, excluding any administrative leave of absence. Rowlands shall cease to be entitled to monthly Transition Compensation payments upon the termination of his employment for any reason. Notwithstanding the foregoing, if Rowlands's employment is terminated by Merrill Lynch other than for Cause (as defined below) or his employment is terminated by reason of death or disability (as defined in the applicable Long Term Disability Plan) ("Disability") (collectively, "Qualifying Termination"), Merrill Lynch agrees to pay Rowlands or his estate a lump sum payment equal to the remaining Transition Compensation payments through the End Date, less any outstanding debts Rowlands owes Merrill Lynch. Such lump sum shall be paid as soon as administratively possible (but in no event later than 2 ½ months after the end of the calendar year in which the Qualifying Termination occurs). In the event that Rowlands resigns or his employment is terminated by Merrill Lynch for Cause, Rowlands shall cease to be entitled to any further monthly Transition Compensation payments and will not receive any lump sum payment as described in this paragraph.

      b)  Additional Transition Compensation. Rowlands understands and agrees that the purpose and intent of this compensation is to reward Financial Advisors who transition new client assets to Merrill Lynch. Consistent with that objective, if Rowlands meets either of the Asset Requirements (below) **on the ending settlement date** for the month of May 2017 ("Deadline"), Rowlands shall be entitled to additional monthly transition compensation payments ("Additional Transition Compensation") for **ninety-six (96)** months (which will be consecutive unless the Additional Transition Compensation is suspended for a Leave of Absence, defined above) beginning as soon as administratively possible after it is determined that Rowlands met one of the Asset Requirements on the Deadline. The amount of the monthly Additional Transition Compensation payment is determined as follows:

      1)  65% Asset Requirement: If the assets of customers in accounts serviced by Rowlands (*excluding* Existing Business, defined below) ("Client Assets") total **at least 65% but less than 75%** of Ninety-Six Million Seven Hundred Fifty-Six Thousand Seven and 00/100 Dollars ($96,756,007.00) as reflected by PMAC (defined below) on the Deadline, the

Additional Transition Compensation payment will be Two Thousand Nine Hundred Nineteen and 76/100 Dollars ($2,919.76); OR

        2)      75% Asset Requirement: If the Client Assets (as reflected by PMAC on the Deadline) total **at least 75%** of Ninety-Six Million Seven Hundred Fifty-Six Thousand Seven and 00/100 Dollars ($96,756,007.00), the Additional Transition Compensation payment will be Five Thousand Eight Hundred Forty and 84/100 Dollars ($5,840.84).

In order to receive any Additional Transition Compensation payments, Rowlands understands that he must meet either Asset Requirement on the Deadline. For purposes of determining whether Rowlands met either Asset Requirement on the Deadline, Client Assets reflected on "PMAC" (the current name for the Financial Advisor monthly reporting tool that tracks the assets of customers in accounts serviced by Rowlands) will be adjusted, after the Deadline, to exclude Existing Business. Rowlands understands that Existing Business will not count toward either Asset Requirement, even though it may be recorded in PMAC. Rowlands shall cease to be entitled to the Additional Transition Compensation payments upon the termination of his employment for any reason. Notwithstanding the foregoing, if Rowlands's employment is terminated as a result of a Qualifying Termination, Merrill Lynch agrees to pay Rowlands or his estate a lump sum payment equal to the remaining Additional Transition Compensation payments through the end of the **ninety-six (96)** month period, less any outstanding debts Rowlands owes Merrill Lynch. Such lump sum shall be paid as soon as administratively possible (but in no event later than 2 ½ months after the end of the calendar year in which the Qualifying Termination occurs). In the event that Rowlands resigns or his employment is terminated by Merrill Lynch for Cause, Rowlands shall cease to be entitled to any further monthly Additional Transition Compensation payments and will not receive any lump sum payment as described in this paragraph.

        ii)      Incentive Compensation Program. Rowlands will be paid in accordance with the Merrill Lynch Financial Advisor Incentive Compensation Program, which will be subject to change from time to time by the Company.

        iii)      Asset Hurdle/Production Credit Bonus (PC50). Rowlands understands and agrees that the purpose and intent of this bonus is to reward Financial Advisors who transition new client assets to Merrill Lynch. Rowlands understands and agrees that

Existing Business is excluded from Client Assets (defined below) for purposes of any bonus under this Agreement. Accordingly, provided that a request to transfer Rowlands's Series 65 (IAR) registration waiver is granted or Rowlands obtains his Series 65 (IAR) registration within his first one hundred twenty (120) days of employment, and subject to the Conditions and Payment terms below, Rowlands will be eligible for up to five (5) production credit based bonuses ("Bonus") as follows:

a)    If the Client Assets (defined below) total at least Eighty-Five percent (85%) of Advertised Assets (defined below) ("1st Asset Hurdle") at the conclusion of his first twelve (12) months of employment (defined below), Rowlands will be eligible for a bonus equal to Fifty percent (50%) of the Production Credits (defined below) generated during the first twelve (12) months of his employment ("12 Month Bonus").

b)    If the Client Assets total at least One Hundred percent (100%) of Advertised Assets ("2nd Asset Hurdle") at the conclusion of his first twenty-four (24) months of employment, Rowlands will be eligible for a bonus equal to Thirty percent (30%) of the Production Credits generated during the immediately preceding twelve (12) months of his employment ("24 Month Bonus").

c)    If the Client Assets total at least One Hundred Fifteen percent (115%) of Advertised Assets ("3rd Asset Hurdle") at the conclusion of his first thirty-six (36) months of employment, Rowlands will be eligible for a bonus equal to Twenty percent (20%) of the Production Credits generated during the immediately preceding twelve (12) months of his employment ("36 Month Bonus").

d)    If the Client Assets total at least One Hundred Twenty-Five percent (125%) of Advertised Assets ("4th Asset Hurdle") at the conclusion of his first forty-eight (48) months of employment, Rowlands will be eligible for a bonus equal to Fifteen percent (15%) of the Production Credits generated during the immediately preceding twelve (12) months of his employment ("48 Month Bonus").

e)    If the Client Assets total at least One Hundred Fifty percent (150%) of Advertised Assets ("5th Asset Hurdle") at the conclusion of his first sixty (60) months of employment, Rowlands will be eligible for a bonus equal to Ten percent (10%) of the Production Credits generated during the immediately preceding twelve (12) months of his employment ("60 Month Bonus").

f)    Definitions. The following definitions shall apply:

(1) "Client Assets" means the assets of customers in accounts serviced by Rowlands, as reflected by PMAC (defined below) on **the ending settlement date** for the month in which the applicable 12/24/36/48/60 month period ends, minus Existing Business;

(2) "Production Credits" means the production credits generated from business activities in accounts serviced by Rowlands during the applicable twelve (12) month period, as reflected by PMAC (defined below) on **the ending settlement date** for the month in which the applicable 12/24/36/48/60 month period ends;

(3) "Advertised Assets" means Ninety-Six Million Seven Hundred Fifty-Six Thousand Seven and 00/100 Dollars ($96,756,007.00);

(4) For purposes of determining whether Rowlands meets the applicable Asset Hurdle at the conclusion of the applicable 12/24/36/48/60 month period, each period of employment begins on **the beginning settlement date** for December 2016 and concludes 12/24/36/48/60 months later on **the ending settlement date** for November;

(5) "PMAC" is the current name for the monthly reporting tool that records the Production Credits and assets of customers in accounts serviced by Rowlands, which will be adjusted after the applicable performance period concludes to exclude Existing Business and determine Client Assets. PMAC's "deal tracker" provides preliminary bonus projections using only the Production Credits and assets of customers in accounts serviced by Rowlands; the "deal tracker" does not reflect adjustments for Existing Business that will be made after the applicable performance period concludes.

(6) "Existing Business" is excluded from Client Assets (and will not count toward the Asset Requirement or any Asset Hurdle under this Agreement).

Existing Business includes all customer assets that were serviced at Merrill Lynch or an affiliated entity by another financial advisor or client relationship professional ("Other FA") before Rowlands began servicing the customer assets. Examples of Existing Business include (but are not limited to):

- accounts assigned to or shared with Rowlands  as a result of Rowlands forming or joining a team, split, pool, or partnership with an Other FA (including accounts or assets assigned to or shared with Rowlands as a result of Rowlands entering into an arrangement with a US Trust PCA);
- assets that transfer from an Other FA's prior employer to Merrill Lynch within the Other FA's first year of employment (even if the transfer occurs after formation of the team, split, pool, or partnership);

- assets reassigned to Rowlands pursuant to the Merrill Lynch Account Redistribution Policy (including assets that Rowlands is permitted to retain after a teammate leaves production); and
- assets inherited pursuant to the Merrill Lynch Client Transition Program or Merrill Lynch Client Transition Program for Senior Consultants (or any similar program intended to compensate transitioning brokers); and
- "Bannered Accounts" linked to accounts that were serviced by an Other FA before being reassigned to Rowlands.

"Bannered Accounts" are certain customer assets that appear on Rowlands's PMAC because the client has agreed to link their Bank of America, N.A. Certificates of Deposit, Checking Accounts, Savings Accounts, and/or MLHL (Merrill Lynch Home Loans) mortgages and equity lines of credit to a Merrill Lynch account serviced by Rowlands.   Except as noted above, Bannered accounts are not considered Existing Business for purposes of this Agreement.

The amount of Existing Business assets excluded from Client Assets will be THE LESSER OF 1) the value at the time Rowlands began servicing the Existing Business assets OR 2) the value of the Existing Business assets on the Deadline (for purposes of Additional Transition Compensation) or the ending settlement date for the month in which the applicable 12/24/36/48/60 performance period ends (for purposes of any Bonus under this Agreement).

EXAMPLES:

- Other FA services a client with $100MM in assets under management.  Other FA and Rowlands form a Situational Team to service this $100MM relationship in a 50/50 pool, which results in Rowlands's PMAC reflecting a $50MM increase in client assets. *The $50MM increase constitutes Existing Business and will not count towards Rowlands meeting any Asset Hurdle.*

- If, after the Situational Team is formed, the client withdraws $50MM from the accounts in the pool number, *$25MM in Existing Business* ($100MM-$50MM/2) will be excluded from Client Assets *and will not count towards Rowlands meeting any Asset Hurdle.*

- If, after the Situational Team is formed, the client opens a new $200MM account that is serviced in the pool number, the $100MM recorded on Rowlands's PMAC as a result of this new account *is not* Existing Business and *will* count towards the Asset Hurdle.

g)   Conditions.

1)   To be eligible for any Bonus under this Agreement, Rowlands must remain in the continuous employ of Merrill Lynch through the date the specific Bonus is paid; and

2)   For purposes of this Agreement, "Velocity" means the production generated by business activities in accounts serviced by Rowlands during any 12 month period (as reflected by PMAC and excluding wrap fees and insurance related commissions) divided by the average assets for the same 12 month period. Velocity in excess of 1.5% on the ending settlement date for any bonus period will presumptively disqualify Rowlands from receiving a Bonus under this Agreement. Notwithstanding the foregoing, if Rowlands's Velocity is greater than 1.5% and Rowlands is otherwise eligible for the applicable Bonus, then Merrill Lynch may in its sole discretion consider whether there is a legitimate explanation for the excess Velocity (for example, a large number of fee based accounts). If Merrill Lynch determines in its sole discretion that a legitimate explanation exists for the excess Velocity, Rowlands shall remain eligible for the Bonus, subject to all other Conditions and Payment provisions; and

3)   Merrill Lynch reserves the right to deny or delay payment of any Bonus if it determines, in its sole discretion, that a reasonable basis exists to believe (a) Rowlands violated the Company's policies regarding churning, unauthorized trades, or suitability, resulting in increased revenue and/or production attributable to Rowlands; or (b) Rowlands violated the Bank of America Corporation Code of Conduct (or any similar ethics policy applicable to financial advisors); or (c) Rowlands attempted to meet or exceed any Asset Hurdle by manipulating, in any way, the number of client assets recorded in his production number(s). For example, Rowlands would be manipulating client assets if he entered into an asset split or pooling arrangement with another Financial Advisor to temporarily journal a portion of the other Financial Advisor's assets to Rowlands. As another example, Rowlands would be manipulating client assets if he is or becomes part of a team of Financial Advisors, and one or more team members change from a producing role to a non-producing role, or leave the team, resulting in Rowlands qualifying for a bonus that he would not have been eligible to receive but for the change in team structure.

8

h)      Payment. Any Bonus under this Agreement shall be awarded as follows:

(1)   Cash Award. Fifty Percent (50%) of the Bonus will be awarded in the form of cash which will be paid in a lump sum as soon as administratively possible (but in no event later than 2 ½ months after the end of the calendar year in which the applicable 12/24/36/48/60 month bonus period ends); and

(2)   Deferred Contingent Award. Fifty Percent (50%) of any Bonus will be awarded in the form of a Deferred Contingent Award (the "Award") that will be subject to the terms and conditions of the Merrill Lynch & Co., Incorporated Short Term Deferred Contingent Award Plan ("the Plan"), the payment of which is contingent on Rowlands's continued employment through, and will not be payable until after the vesting date as specified below. Each Award (plus any increase or decrease on such amount resulting from the notional investments) (as adjusted based on notional returns, the "Adjusted Award") will vest in one increment five (5) years from the date the Bonus is awarded ("Vesting Date") and will be paid in accordance with the Plan as soon as administratively possible after the Vesting Date (but in no event later than 2 ½ months after the end of the calendar year in which the Vesting Date occurs). In the event that Rowlands's employment terminates for any reason other than death, any portion of the Adjusted Award that is not yet vested IS NOT PAYABLE AND WILL NOT BE PAID. In addition, except as otherwise provided in the Plan, no portion of the Adjusted Award will be paid prior to the Vesting Date, at which time and to the extent vested, the full Adjusted Award under the Plan will be paid to Rowlands in accordance with the Plan. In accordance with the terms of the Plan, Rowlands acknowledges that any interest he may have in any amounts deferred under the Plan is that of an unsecured general creditor of Merrill Lynch; and

4.      For the purposes of this Agreement, "Cause" shall mean: (i) violation of federal securities laws, rules or regulations; (ii) violation of any rules or regulations of any regulatory or self-regulatory organization; (iii) violation, as reasonably determined by Merrill Lynch management, of Merrill Lynch's rules, regulations, policies, practices, directions and/or procedures; (iv) criminal conduct that could either result in Rowlands's statutory disqualification or could reasonably result in harm to Merrill Lynch or Merrill Lynch's reputation, as reasonably determined by Merrill Lynch management; (v) a suspension, bar, or limitation on Rowlands's activities for Merrill Lynch by any regulatory or self-regulatory organization; (vi) violation of

Merrill Lynch's policies against discrimination and harassment; (vii) failure to obtain and/or maintain license(s) and required registration(s); (viii) dishonesty in connection with Rowlands's employment as a Merrill Lynch Financial Advisor; (ix) failure to fulfill or to meet any financial obligations that exist between Rowlands and Merrill Lynch for a period of four consecutive months that occur outside the first six months of employment; (x) performing any act which would result in a violation of the GWIM U.S. Political Contributions Policy or Rule 206(4)-5 under the Investment Advisers Act of 1940, as amended; or (xi) providing inaccurate, false, or incomplete representations to Merrill Lynch, including, but not limited to those representations set forth in Paragraph 1 above.

     5.    Rowlands agrees that all customer information (including all contact and account information), whether maintained on a physical piece of paper (in original or copied form) or stored electronically on a computer, PDA, BlackBerry, cell phone or other device, is confidential and proprietary to Merrill Lynch ("Confidential Information"). Rowlands understands and agrees that Confidential Information includes any information concerning leads and referrals as well as information concerning clients serviced by Rowlands as the result of any lead or referral provided by Bank of America. Rowlands agrees not to disclose Confidential Information to any third party, including competitors of Bank of America, at any time during Rowlands's employment with Merrill Lynch, except for the purposes of conducting business on behalf of Merrill Lynch, or at any time after termination. Upon termination of his employment, Rowlands will immediately return all Confidential Information to Merrill Lynch and will relinquish access to, possession of, and control over any such information in any form. All confidentiality and non-disclosure obligations are subject to the exceptions set forth in paragraph 17 of this Agreement, except that Rowlands understands and agrees that such exceptions do not permit use or disclosure of Confidential Information for any competitive purpose.

     6.    For a period of one year following the termination of Rowlands's employment with Merrill Lynch for any reason, Rowlands agrees not to solicit, or initiate contact or communication with, either directly or indirectly, any account, customer, client, prospect, lead or referral whom Rowlands served or whose name became known to Rowlands during his employment at Merrill Lynch. This restriction will not apply to clients whom Rowlands served as a registered representative at his prior employer who become clients of Merrill Lynch within one year after he begins employment with Merrill Lynch. For purposes of the Protocol for

Broker Recruiting ("Protocol"), Rowlands understands and agrees that any Bank Referrals (defined below) are not covered by the Protocol. "Bank Referrals" include: any leads or referrals provided by Bank of America under various programs and initiatives by which Bank of America refers institutionally sourced clients into Merrill Lynch Global Wealth and Investment Management (GWIM), including but not limited to the Program for the Distribution of Leads & Referrals to GWIM (collectively "Bank Referral Programs"); clients converted from such leads and referrals (including any clients reassigned to Rowlands under the Merrill Lynch Account Redistribution Policy who were originally converted from a lead or referral under a Bank Referral Program); and/or clients and accounts properly householded with such clients. In other words, if Rowlands is given the opportunity to participate in any Bank Referral Program and chooses to do so, Rowlands understands and agrees that he is prohibited from taking any information or soliciting any Bank Referrals even if Rowlands joins a firm that is a signatory to the Protocol.

7.    At all times during Rowlands's employment and for a period of one year following the termination of Rowlands's employment with Merrill Lynch for any reason, Rowlands agrees not to recruit or solicit, either directly or indirectly, any Merrill Lynch employee or employees to resign from Merrill Lynch or to join Rowlands or his new firm. References above to Merrill Lynch include Bank of America.

8.    In the event that Rowlands breaches, or Merrill Lynch reasonably anticipates that Rowlands is about to breach, any of the covenants of paragraphs 5, 6, or 7, Rowlands agrees and recognizes that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo. Therefore, ROWLANDS AGREES THAT MERRILL LYNCH MAY OBTAIN A TEMPORARY RESTRAINING ORDER, WITH OR WITHOUT NOTICE, and A PRELIMINARY and PERMANENT INJUNCTION ordering:

    a)    that Rowlands immediately return to Merrill Lynch all customer information and records, whether original, copied, duplicated, reproduced, computerized, handwritten, recreated, compiled, or stored in any way whatsoever, and that Rowlands be enjoined and restrained from using or disclosing all such information and records;

    b)    that, for a period of one year, Rowlands be enjoined and restrained from soliciting any customer whom Rowlands served or whose name became known to Rowlands

while employed by Merrill Lynch pursuant to his obligations in paragraph 6 subject to the stated exclusion in paragraph 6; and

        c)     that, for a period of one year, Rowlands be enjoined and restrained from recruiting or soliciting any Merrill Lynch employee or employees to resign from Merrill Lynch or to join Rowlands or Rowlands's new employer.

        References above to Merrill Lynch include Bank of America.

    9.     Rowlands understands and agrees that if he is a party to any agreement, obligation, or other commitment that requires the repayment of training costs to his former employer upon his termination of employment, Rowlands will be solely and exclusively responsible for the repayment of those costs. Merrill Lynch will have no obligation with respect to such costs and will not indemnify or reimburse Rowlands in any way for the repayment of any training costs owed to any former employer or other business. References above to Merrill Lynch include Bank of America.

    10.    Rowlands acknowledges that Merrill Lynch, in its sole discretion and in furtherance of its business objectives, may choose to release information about Rowlands to certain internal and external media publications, including but not limited to information pertaining to his name, date of hire, biographical facts, office location, employment history, education, and/or annual production. Rowlands hereby grants Merrill Lynch permission and authorizes the release of such information to electronic or print publications, including but not limited to Merrill Lynch internal publications, the local news media, Dow Jones Newswires, the Wall Street Journal, "Broker World," and other external industry publications. This consent/authorization shall continue without limitation during the first ninety (90) days of Rowlands's employment, after which time the consent/authorization shall expire.

    11.    Rowlands acknowledges that he has executed or will execute other forms or agreements, including the Bank of America Applicant Acknowledgement Form, in connection with his employment. To the extent any of the restrictions in this Agreement, including but not limited to the confidentiality and non-solicitation provisions differ from the provisions contained in any other form or agreement, Rowlands acknowledges and agrees that he is bound by the more restrictive provisions contained in this Agreement. For example, even though the Applicant Acknowledgement Form contains a six month restriction on the solicitation of customers,

Rowlands is bound and must abide by the one-year non-solicitation obligation contained in this Agreement.

12.    Merrill Lynch's rights under this agreement shall be freely assignable by Merrill Lynch and shall inure to the benefit of Merrill Lynch's successors and assigns, affiliated entities, and any current or future party-in-interest. References above to Merrill Lynch include Bank of America.

13.    The terms of this agreement shall be in full force and effect at all times during Rowlands's employment and shall survive his employment. In addition, nothing herein is a promise of employment for a fixed term or otherwise modifies the at-will status of Rowlands's employment. Rowlands shall be employed by Merrill Lynch on an at-will basis and nothing herein shall be construed as a contract of employment for a definite period of time or term. References above to Merrill Lynch include Bank of America.

14.    In the event Rowlands changes employment within the securities industry or otherwise becomes employed in competition with Merrill Lynch, Rowlands (a) agrees to advise his new employer regarding the existence of this agreement and the terms contained herein; (b) agrees to provide a copy of this agreement to his new employer prior to Rowlands's acceptance of employment with said employer; and (c) authorizes Merrill Lynch to provide a copy of this agreement to Rowlands's new employer.   References above to Merrill Lynch include Bank of America.

15.    Exit Interview. Should Rowlands's employment with the Company end voluntarily or involuntarily, Rowlands may request an exit interview with a GWIM Employee Relations Manager. Exit interviews are a valuable method of collecting honest and candid feedback on Rowlands's employment experience with the Company. If Rowlands is interested in scheduling an exit interview prior to or after Rowlands's separation, Rowlands may contact his HR Partner, or Rowlands may also call the GWIM Employee Relations team directly at 1-800-556-6044.

16.    Nothing in this Agreement prevents Rowlands from providing information in response to valid and enforceable subpoenas or as otherwise required by law or regulation, from providing information necessary for preparation and filing of any income tax return, or from using this Agreement to enforce its terms.   Notwithstanding the foregoing, although Merrill Lynch recognizes the need for employees to act in an open and cooperative manner in responding

to governmental, regulator or other legal inquiries and information requests, it is nevertheless essential that all responses *on behalf of the Company* be based on sound legal and regulatory guidance. Accordingly, Rowlands understands and agrees that, subject to paragraph 17 below, he must not initiate contact or engage in substantive contact with a regulator representative or outside attorney, including off-the-record interviews, or respond to any regulatory or legal inquiries *directed to the Company* without first notifying his branch manager, who will seek guidance from the appropriate compliance/legal partner(s).

17.     Nothing in this Agreement prohibits or limits Rowlands or his attorney from initiating communications directly with, responding to any inquiry from, volunteering information to, or providing testimony before, the Securities and Exchange Commission, the Department of Justice, FINRA, any other self-regulatory organization or any other governmental, law enforcement, or regulatory authority, in connection with any reporting of, investigation into, or proceeding regarding suspected violations of law. Rowlands understands that he is NOT required to advise or seek permission from the Company before engaging in any such activity. In connection with any such activity permitted above, Rowlands should identify any information that is confidential and ask the government agency for confidential treatment of such information. Notwithstanding the foregoing, Rowlands is not permitted to reveal to any third-party, including any governmental, law enforcement, or regulatory authority, information he came to learn during the course of his employment with the Company that is protected from disclosure by any applicable privilege, including but not limited to the attorney-client privilege, attorney work product doctrine and/or other applicable legal privileges. The Company does not waive any applicable privileges or the right to continue to protect privileged attorney-client information, attorney work product, and other privileged information. Additionally, Rowlands recognizes that his ability to disclose information may be limited or prohibited by applicable law and the Company does not consent to disclosures that would violate applicable law. Such applicable laws include, without limitation, laws and regulations restricting disclosure of confidential supervisory information[1] or disclosures subject to the Bank Secrecy Act (31 U.S.C.

---

[1]  Confidential supervisory information includes any information or materials relating to the examination and supervision of the Company by applicable bank regulatory agencies, Company materials responding to or referencing non-public information relating to examinations or supervision by bank regulatory agencies and correspondence to or from applicable banking regulators.

§§ 5311-5330), including information that would reveal the existence or contemplated filing of a suspicious activity report.

    18.    This Agreement constitutes the sole agreement between the parties as to the subject matter hereof and Rowlands represents that in executing this Agreement, Rowlands has not relied upon any statement or representation not set forth herein.

    19.    ROWLANDS HAS READ AND REVIEWED THIS EMPLOYMENT AGREEMENT AND RESTRICTIVE COVENANTS IN ITS ENTIRETY AND HAS HAD SUFFICIENT OPPORTUNITY TO RECEIVE LEGAL COUNSEL.  ROWLANDS FULLY UNDERSTANDS THE TERMS OF THIS DOCUMENT AND KNOWINGLY AND FREELY AGREES TO ABIDE BY THEM.

**MERRILL LYNCH, PIERCE,**
**FENNER & SMITH INCORPORATED**

By: _____

Date: _10/21/2016_

_____
**WAYNE ROWLANDS**

Date: _10-21-2016_

EXHIBIT
"2"

## PROMISSORY NOTE

**FOR VALUE RECEIVED** and other good and valuable consideration, the undersigned, WAYNE ROWLANDS hereby unconditionally promises to pay to the order of MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED ("Merrill Lynch") or the legal holder of this Note at the time of payment (collectively "the Lender"), the principal sum of Two Million Thirty-Seven Thousand Seven Hundred Seventy-One and 00/100 Dollars ($2,037,771.00) in lawful money of the United States of America, with interest at the rate of 2%.

This Note is subject to the following further terms and conditions:

1.      **Mandatory Amortization.**

The sum of Twenty-One Thousand One Hundred Seventy-One and 12/100 Dollars ($21,171.12) shall be due and payable each month by the undersigned to the Lender pursuant to the following loan amortization schedule. For the convenience of the undersigned, such amount shall be deducted, on a monthly basis, from the undersigned's compensation from Merrill Lynch for the months of February 2017 through October 2025 (e.g. the amount deducted from the undersigned's compensation for the month of January will be reflected in the first paycheck undersigned receives in February, when January compensation is paid). For purposes of this Note, "compensation" shall include, but not be limited to, incentive compensation, transition compensation and/or bonuses, but does not include salary paid to the undersigned by Merrill Lynch.

By signing this Note, the undersigned explicitly authorizes Merrill Lynch to deduct the above amount from compensation on a monthly basis, as long as the loan remains unpaid. The undersigned acknowledges that Merrill Lynch will make these deductions solely to facilitate the payment of interest and principal on this Note and that these deductions are a benefit to the undersigned. Should the combined net after-tax amount of the undersigned's compensation for any month be an amount less than Twenty-One Thousand One Hundred Seventy-One and 12/100 Dollars ($21,171.12), the difference between the combined net after-tax amount of the undersigned's compensation for any month and Twenty-One Thousand One Hundred Seventy-One and 12/100 Dollars ($21,171.12) ("monthly deficiency") shall be due and payable by the undersigned on demand. Further, the Lender may recover, without limitation, any such monthly deficiency from any account held at the Lender or its affiliates (including, but not

1

2:/10.20.2016 (2:08:03 pm)

limited to, Bank of America, National Association) by the undersigned alone or jointly with another (including, but not limited to, the undersigned's Cash Management Account), from any compensation, credits, or property of the undersigned that is/are in the possession or control of Merrill Lynch for any reason (except that in no event shall any amounts be deducted from the undersigned's salary); and/or from any subsequent compensation as set forth elsewhere in this Note. The Lender's right to recover any deficiency (including any monthly deficiency) with respect to this Note shall not be limited to recovery from the sources described above, but rather the Lender shall have a right to full recovery and may pursue all recourses permitted by law.

## 2.    Mandatory Prepayment.

Notwithstanding anything to the contrary contained herein, all outstanding principal and accrued but unpaid interest on this Note shall become due and immediately payable if (a) the undersigned's employment with Merrill Lynch is terminated for any reason; or (b) the undersigned becomes insolvent or files for bankruptcy.

The undersigned understands and agrees that, in the event mandatory prepayment is triggered, to the maximum extent permitted by law, the Lender shall have the right to place a "pend" status on, hold as security, subject to a lien, and/or deduct all outstanding principal and accrued but unpaid interest from any account held by undersigned at the Lender or its affiliates (including, but not limited to, Bank of America, National Association), whether alone or jointly with another, including but not limited to any Cash Management Account ("undersigned's accounts"). The Lender's right to recover all amounts due under this Note shall not be limited to recovery from undersigned's accounts, but rather the Lender shall have a right to full recovery and may pursue all recourses permitted by law.

## 3.    Prepayment at Option of the Undersigned.

The undersigned may, at the undersigned's option and upon no less than ten (10) business days notice to the Lender, prepay this Note in full at any time without penalty or premium in lawful money of the United States. There shall be no right to prepay this Note in part.

4.    **Payment.**

All payments and prepayments of principal and interest on this Note shall be made to the Lender or its order in lawful money of the United States of America. In the event the undersigned fails to timely make any payments due and owing under the Note, the accrued and unpaid interest hereunder shall thereafter bear the same rate of interest as the principal hereunder, but in no event shall interest be charged that would violate any applicable usury law. The undersigned hereby expressly waives presentment and demand for payment, protest, notice of dishonor and all other demands and notices of any kind at such time as any payments are due under this Note. Where permitted by law, the undersigned shall reimburse the Lender for any and all damages, losses, costs and expenses (including attorneys' fees and court or arbitrator costs) incurred or sustained by the Lender as a result of the breach by the undersigned of any of the terms of this Note or in connection with the enforcement of the terms of this Note.

5.    **Nature of Obligations.**

This Note is a full recourse Note against the undersigned. The undersigned shall be personally liable for full payment of the unpaid principal balance of this Note and accrued interest hereunder. No provision of this Note shall alter or impair the obligation of the undersigned, which obligation is absolute and unconditional, to pay the outstanding principal balance and accrued interest owing under this Note at the time, and in the manner set forth herein. Undersigned agrees that any amounts due under this Note are not consumer debt, and that any debt incurred hereunder is not primarily for personal, family or household purposes, but for business and commercial purposes only.

6.    **Offsets.**

If the undersigned's repayment obligations hereunder are not satisfied in full when due, the Lender shall be entitled (to the extent permitted by law) to apply any amounts owed to the undersigned by the Lender or its affiliates as an offset against any repayment deficiency. In addition, to the extent the undersigned is required by law and/or policy to maintain personal accounts and investments at the Lender or its affiliates, the Lender shall be entitled (to the extent permitted by law) to offset any amounts owed with property, securities, or funds in such accounts or investments.

7.    **Miscellaneous.**

(a)    The provisions of this Note shall be governed by and construed in accordance with the laws of the State of New York, without reference to the principles of choice of law thereof.

(b)    No previous waiver and no failure or delay by the Lender or the undersigned in acting with respect to the terms of this Note shall constitute a waiver of any breach, default or failure of condition under this Note or the obligations secured thereby. A Waiver or modification of any term of this Note or any of the obligations secured thereby must be made in writing and signed by a duly authorized officer of the Lender and shall be limited to the express terms of such waiver or modification. Undersigned may not rely on any oral waivers or modifications and no such oral waiver or modification shall be binding on Lender or otherwise effective.

(c)    This Note does not constitute an agreement to employ undersigned for a specified period of time, and undersigned's employment with Merrill Lynch may be terminated at any time, with or without notice or cause.

(d)    Nothing herein shall require an indemnity or authorize a deduction that violates the law of the state in which undersigned is employed at the time the indemnity obligation or deduction would be made.

(e)    The provisions of this Note shall be severable and, if any provisions hereof shall be determined by a court or arbitrator(s) to be legally unenforceable or void, undersigned agrees the remaining provisions of this Note shall be deemed valid and fully effective.

(f)    All notices and other communications hereunder shall be in writing and will be deemed to have been duly given if delivered or mailed.

(g)    The headings contained in this Note are for reference purposes only and shall not affect in any way, the meaning or interpretation of the provisions hereof.

(h)    This Note shall inure to the benefit of the Lender, its affiliates, and any successors in interest to the Lender's business, whether through merger, acquisition, sale, or other transfer, or to any other legal holder of this Note. The Lender may assign any or all of its rights, obligations and interests hereunder to any party without the consent of the undersigned. The undersigned shall not have the right to assign any of the undersigned's rights, obligations or interests hereunder.

(i)    This Note contains the complete understanding between the undersigned and the Lender relating to the matters contained herein and supersedes all prior oral, written and contemporaneous oral negotiations, commitments and understandings between and among the Lender and the undersigned.  The undersigned did not rely on any statements, promises or representations made by the Lender or any other party in entering into this Note.

_Wayne Rowlands_          10 -21- 2016

**WAYNE ROWLANDS**

State of                              )
                                      ): ss.
County of                             )


Subscribed and Sworn to
before me this _____ day
of _____, 2016.

CA NOTARY JURAT ATTACHED

_____
**NOTARY PUBLIC**

5 of 6

2:/10.20.2016 (2:08:03 pm)

## California Jurat

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of** *Sonoma*

Subscribed and sworn to (or affirmed) before me, Julie A Gwin, Notary Public,

on this *21* day of *OCT* , 2016, by

** *Wayne Rowlands* — **

proved to me on the basis of satisfactory evidence to be the person(s) who

appeared before me.

**Signature** _____

Julie A Gwin, Notary Public
COMMISSION EXP 3-14-2017

JULIE A. GWIN
COMM. # 2007673
NOTARY PUBLIC - CALIFORNIA
SONOMA COUNTY
MY COMM. EXPIRES MAR. 14, 2017

(seal)

Attached to Document *Promissory Note* Page *6* of *6*

# EXHIBIT B

## Form 1099-MISC (Copy B)

☐ CORRECTED (if checked)

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

MERRILL LYNCH, PIERCE, FENNER & SMITH INC
ONE BRYANT PARK
NEW YORK, NY 10036
800-556-6044

OMB No. 1545-0115

**2021**
Form **1099-MISC**

**Miscellaneous Information**

**Copy B For Recipient**

This is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

| Field | Amount |
|---|---|
| 1 Rents | $ |
| 2 Royalties | $ |
| 3 Other income | $ 1397293.92 |
| 4 Federal income tax withheld | $ |
| 5 Fishing boat proceeds | $ |
| 6 Medical and health care payments | $ |
| 7 Payer made direct sales totaling $5,000 or more of consumer products to a recipient for resale ☐ | |
| 8 Substitute payments in lieu of dividends or interest | $ |
| 9 Crop insurance proceeds | $ |
| 10 Gross proceeds paid to an attorney | $ |
| 11 Fish purchased for resale | $ |
| 12 Section 409A deferrals | $ |
| 13 Excess golden parachute payments | $ |
| 14 Nonqualified deferred compensation | $ |
| 15 State tax withheld | $ |
| 16 State/Payer's state no. ██ 251-4 | |
| 17 State income | $ 1397293.92 |

PAYER'S TIN ████4085   RECIPIENT'S TIN ████9057

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code

LAURA M BURNS

Account number (see instructions)   FATCA filing requirement ☐

Form 1099-MISC   (keep for your records)   www.irs.gov/Form1099MISC   Department of the Treasury - Internal Revenue Service

---

## Form 1099-MISC (Copy 2)

☐ CORRECTED (if checked)

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

MERRILL LYNCH, PIERCE, FENNER & SMITH INC
ONE BRYANT PARK
NEW YORK, NY 10036
800-556-6044

OMB No. 1545-0115

**2021**
Form **1099-MISC**

**Miscellaneous Information**

**Copy 2**
To be filed with recipient's state income tax return, when required.

| Field | Amount |
|---|---|
| 1 Rents | $ |
| 2 Royalties | $ |
| 3 Other income | $ 1397293.92 |
| 4 Federal income tax withheld | $ |
| 5 Fishing boat proceeds | $ |
| 6 Medical and health care payments | $ |
| 7 Payer made direct sales totaling $5,000 or more of consumer products to a recipient for resale ☐ | |
| 8 Substitute payments in lieu of dividends or interest | $ |
| 9 Crop insurance proceeds | $ |
| 10 Gross proceeds paid to an attorney | $ |
| 11 Fish purchased for resale | $ |
| 12 Section 409A deferrals | $ |
| 13 Excess golden parachute payments | $ |
| 14 Nonqualified deferred compensation | $ |
| 15 State tax withheld | $ |
| 16 State/Payer's state no. ██ 251-4 | |
| 17 State income | $ 1397293.92 |

PAYER'S TIN ████4085   RECIPIENT'S TIN ████9057

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code

LAURA M BURNS

Account number (see instructions)   FATCA filing requirement ☐

Form 1099-MISC   www.irs.gov/Form1099MISC   Department of the Treasury - Internal Revenue Service

---

## Form 1099-MISC (Copy 2)

☐ CORRECTED (if checked)

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

MERRILL LYNCH, PIERCE, FENNER & SMITH INC
ONE BRYANT PARK
NEW YORK, NY 10036
800-556-6044

OMB No. 1545-0115

**2021**
Form **1099-MISC**

**Miscellaneous Information**

**Copy 2**
To be filed with recipient's state income tax return, when required.

| Field | Amount |
|---|---|
| 1 Rents | $ |
| 2 Royalties | $ |
| 3 Other income | $ 1397293.92 |
| 4 Federal income tax withheld | $ |
| 5 Fishing boat proceeds | $ |
| 6 Medical and health care payments | $ |
| 7 Payer made direct sales totaling $5,000 or more of consumer products to a recipient for resale ☐ | |
| 8 Substitute payments in lieu of dividends or interest | $ |
| 9 Crop insurance proceeds | $ |
| 10 Gross proceeds paid to an attorney | $ |
| 11 Fish purchased for resale | $ |
| 12 Section 409A deferrals | $ |
| 13 Excess golden parachute payments | $ |
| 14 Nonqualified deferred compensation | $ |
| 15 State tax withheld | $ |
| 16 State/Payer's state no. ██ 251-4 | |
| 17 State income | $ 1397293.92 |

PAYER'S TIN ████4085   RECIPIENT'S TIN ████9057

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code

LAURA M BURNS

Account number (see instructions)   FATCA filing requirement ☐

Form 1099-MISC   www.irs.gov/Form1099MISC   Department of the Treasury - Internal Revenue Service

EXHIBIT C

**REYNOLDS TILBURY WOODWARD LLP**

Tory E. Griffin
tgriffin@rtwlawllp.com

February 28, 2022

Karen Milner
Rubin Forunato
10 South Leopard Road
Paoli, Pennsylvania 19301
kmilner@rubinfortunato.com

Re:     1099 Erroneously issued to Laura Burns; Wayne Rowlands and Merrill Lynch
        Promissory Note

Ms. Milner:

I represent Laura Burns. Ms. Burns has provided me with the following documents: (1) a Form 1099 for 2021 issued by Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") to my client, Laura M. Burns, in the amount of $1,397,293.92 (attached); and (2) a copy of the letter you wrote to Ms. Burns on March 22, 2021, relating to Wayne Rowlands and Merrill Lynch's decision to forgive $1,397,293.92 in debt owed by Mr. Rowlands under the terms of a promissory note following his death (also attached). This letter is to advise that the 1099 is incorrect and demand that Merrill Lynch immediately correct its error by withdrawing the 1099 or amending the 1099 to reflect the amount of $0 as to Ms. Burns and/or change the recipient of the 1099 to Wayne Rowlands. The reasons for this demand are set forth below.

I am sending this letter to you given that you authored the above-referenced letter to my client. I have also copied Merrill Lynch directly on this demand.

As you and Merrill Lynch are well aware, Ms. Burns and Mr. Rowlands were never married. Ms. Burns, in turn, is not a signatory on the promissory note signed by Mr. Rowlands. Absent Ms. Burns being a signatory on the note or a personal guarantor, there is no legal authority to hold Ms. Burns responsible for repayment obligations under the promissory note. In short, it was never Ms. Burns' debt. Given that it was never Ms. Burns' debt, the forgiveness of debt by Merrill Lynch is *not* income to Ms. Burns. If anything, it is income to Mr. Rowlands or his estate. We believe your attached March 22, 2021, letter implicitly acknowledges that any forgiveness of debt would be "income" to Mr. Rowlands' estate, as there is no mention of any 1099 being issued to Ms. Burns. Had you mentioned any belief by Merrill Lynch that Ms. Burns would personally receive a

Karen Milner
Rubin Forunato
February 28, 2022
Page 2

1099 for the amount remaining due on the note, surely Ms. Burns would have promptly objected.

Consequently, on behalf of Ms. Burns we demand that Merrill Lynch immediately withdraw the 1099 issued as to Ms. Burns and/or correct the previously issued 1099 to list the proper recipient of the income through forgiveness of debt, which is *not* Ms. Burns.

Please keep in mind that 28 U.S.C. § 7434 makes it unlawful for any person to willfully file a fraudulent Form 1099 and authorizes a plaintiff to bring a civil action for damages equal to the greater of $5,000 or the actual damages caused by the false filing.  In this instance, the damages to Ms. Burns for having to report income of $1,397,293.92 through forgiveness of debt that she was never obligation to repay would, obviously, well exceed $500,000.  Ms. Burns will hold Merrill Lynch accountable for these damages if forced to do so.

Because time is of the essence, we ask that you confirm receipt of this letter and corrective action no later than March 7, 2022.

REYNOLDS TILBURY & WOODWARD LLP

Tory E. Griffin

cc:

Merrill Lynch, Pierce, Fenner & Smith, Inc.
One Bryant Park
New York, NY 10036

Kelly Doyle Dahan
Norton Rose Fulbright
By email @ Kelly.doyle.dahan@nortonrosefulbright.com



EXHIBIT D

Tory E. Griffin (State Bar No. 186181)
Marc C. Guèdenet (State Bar No. 292868)
**JEPPSON & GRIFFIN, LLP**
1478 Stone Point Drive, Suite 100
Roseville, CA 95661
Telephone: (916) 780-7008
Facsimile: (916) 780-7118

Attorneys for Claimant Laura Burns

# FINRA DISPUTE RESOLUTION

# ARBITRATION

# –o0o–

| | |
|---|---|
| LAURA BURNS, an individual, | Arbitration No. 21-01291 |
| Claimant, | **AMENDED STATEMENT OF CLAIM:** |
| v. | 1. Breach of Fiduciary Duty |
| | 2. Conversion |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, a Delaware corporation, | 3. Constructive fraud |
| | 4. Negligence |
| | 5. Negligent Supervision of Employee |
| Respondent. | 6. Respondeat Superior/Vicarious Liability |

Claimant LAURA BURNS hereby complains and alleges as follows (the "Claim"):

## INTRODUCTION

1.     The purpose of this action is to rectify the bilking of Claimant LAURA BURNS' ("Ms. Burns" or Claimant") investment account by Respondent MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED ("Merrill Lynch" or "Respondent") by its former employee Wayne Rowlands ("Mr. Rowlands").

## PARTIES

2.     Claimant LAURA BURNS is an individual who resides in Placer County, California.

3.     Respondent MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED is a Delaware corporation, which is qualified to and does business in the state

AMENDED STATEMENT OF CLAIM

**JEPPSON & GRIFFIN, LLP**
1478 Stone Point Drive, Suite 100, Roseville, CA 95661

of California.

4.      WAYNE ROWLANDS is a former employee of Respondent and also the former romantic partner of Claimant. Mr. Rowlands passed away on May 29, 2020.

## GENERAL ALLEGATIONS

5.      Respondent Merrill Lynch is a well-known and trusted investment management company, which provides wealth management and investment services.  Merrill Lynch is a registered member of FINRA.

6.      On or about November 2, 2017, Ms. Burns signed a Client Relationship Agreement with Merrill Lynch. Ms. Burns has made numerous requests for a copy the Client Relationship Agreement from Respondent and its agents/employees including Erin Ray, Matthew Davis and Georgiana Anderson, but to date has not been provided with a copy of the same.

7.      In November 2017, Ms. Burns opened a Cash Management Account ending in -607 ("CMA-607"). On or about November 6, 2017, Ms. Burns funded the account.

8.      Mr. Rowlands was a previous, long time employee of Merrill Lynch. Mr. Rowlands commenced his employment with Merrill Lynch on or about December 1984 and worked there until in or about December 2010. After taking employment at another company, Mr. Rowlands returned to employment at Merrill Lynch on or about October 21, 2016. According to Mr. Rowland, Merrill Lynch paid him a $2,200,000 bonus in the form of a loan to be forgiven over a 10-year period.

9.      During the relevant period of times as alleged in this Claim, Mr. Rowlands was employed by Merrill Lynch as a Senior Vice President-Wealth Management.

10.     Prior to Ms. Burns investing approximately $545,000 with Merrill Lynch in or about 2017, Ms. Burns and Mr. Rowland had an intimate, personal relationship.  Mr. Rowlands proposed to Ms. Burns in August 2017.  Ms. Burns and Mr. Rowlands never married each other, however.

11.     To induce Ms. Burns to invest with Merrill Lynch, Mr. Rowlands promised Ms. Burns that he would triple her money within two years. Ms. Burns relied on this representation when deciding to invest with Merrill Lynch.

12.     After making further contributions and withdrawals (not pertinent to the instant

JEPPSON & GRIFFIN, LLP
1478 Stone Point Drive, Suite 100, Roseville, CA 95661

AMENDED STATEMENT OF CLAIM

claim), Ms. Burns' CMA-607 had a net portfolio value of $329,666.69 as of December 29, 2017.

13.    Mr. Rowlands, at all relevant times, was acting as Merrill Lynch's advisor responsible for overseeing and managing Ms. Burns' CMA-607. Both Mr. Rowlands and Merrill Lynch owed Ms. Burns a fiduciary duty to act with the utmost good faith for the benefit of Ms. Burns and to take no advantage from any act relating to the interests or rights of Ms. Burns or her CMA-607.

14.    Beginning in or about January 23, 2018, almost immediately after the account was funded, Mr. Rowlands began using his position as the account representative to make unauthorized withdrawals and sales, without the consent or knowledge of Ms. Burns, from Ms. Burns' CMA-607.

15.    Mr. Rowlands was able to control CMA-607 without the knowledge or consent of Ms. Burns and conceal his transactions which depleted the account by changing the account settings to indicate that it was "Not OK to text" Ms. Burns' cell phone number ending in 9100. As such, Ms. Burns would not receive notices of the unauthorized transactions made by Mr. Rowlands. Mr. Rowlands further concealed his actions from Ms. Burns by assigning Ms. Burns' CMA-607 to the address of 2360 Mendocino Ave., Unit A2, Santa Rosa, California 95403 and later to "2751 4th ST, #128, SANTA ROSA, CA" ("2751 4th ST"), neither of which are Ms. Burns' primary residence, but rather were Mr. Rowlands' addresses. Ms. Burns did not receive mail being sent to either addresses as Mr. Rowlands was the one who collected the mail at those locations. Mr. Rowlands also concealed his actions by changing the account settings of CMA-607 so that his cell phone – a number ending in 1912, which is believed to have been a BlackBerry cell phone issued by Respondent to Mr. Rowlands – was listed as an option for receiving authorization codes for various transactions or items relating to the account, and not Ms. Burns' cell phone. As a result of Mr. Rowlands' actions, any "alerts" relating to CMA-607 would go directly and only to Mr. Rowlands.

16.    Mr. Rowland was able to change the account settings of Ms. Burns' CMA-607 due to his position as Senior Vice President-Wealth Management at Merrill Lynch.

/ / /

JEPPSON & GRIFFIN, LLP
1478 Stone Point Drive, Suite 100, Roseville, CA 95661

AMENDED STATEMENT OF CLAIM

17.     Between January 23, 2018 and September 23, 2019, and totally unknown to Ms. Burns, Mr. Rowlands siphoned approximately $336,450 from Ms. Burns' CMA-607 in a series of transactions, and then used the funds for his own personal gain and benefit.

18.     After Mr. Rowlands misappropriated the funds from Ms. Burns, he then transferred them into another a Cash Management Account ending in -286 ("CMA-286"), which was jointly owned by Ms. Burns and Mr. Rowlands. Mr. Rowlands then used those funds for his own personal gain and benefit.  At no point did he invest the funds on Ms. Burns' behalf as he promised as an inducement to get Ms. Burns to invest her money with Merrill Lynch, under his control, in the first instance.

19.     Ms. Burns did not authorize or personally make any of the transactions between January 23, 2018 and September 23, 2019 relating to the depletion of her CMA-607 to CMA-286. During this time period, she did not have online access to the CMA-286 account and was unaware of the transactions until August 2019.  Mr. Rowlands' active efforts to conceal his theft of Ms. Burns' money effectively prevented Ms. Burns' from discovering his actions until this time.

20.     At all relevant times, Mr. Rowlands was acting with the scope of his employment with Merrill Lynch.

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty

21.     Claimant incorporates the above paragraphs as though fully set forth herein.

22.     At all relevant times, Merrill Lynch and Mr. Rowlands were financial advisors to Ms. Burns and owed Ms. Burns a fiduciary duty of undivided loyalty and to use reasonable care in the administration and investment of Ms. Burns' CMA-607 funds.

23.     Merrill Lynch and Mr. Rowlands knowingly acted against the interests of Ms. Burns and failed to use reasonable care in the management and bilking of Ms. Burns' CMA-607, thereby breaching their fiduciary duties owed to Ms. Burns.

24.     Ms. Burns did not give informed consent to the conduct of Merrill Lynch and/or Mr. Rowlands.

25.     As a direct and proximate result of Respondent's conduct, which was also a substantial factor in causing Claimant's harm, Claimant has suffered special and general damages

JEPPSON & GRIFFIN, LLP
1478 Stone Point Drive, Suite 100, Roseville, CA 95661

4

to be proven at trial.

26.    The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or agents of the Respondent who were acting at all times relevant to this Claim within the scope of their employment. Respondent is liable for the conduct of said agents and employees.

27.    Wherefore, Claimant prays for relief as set forth below and in an amount of at least $336,450, plus interest and attorneys' fees as allowed by law.

## SECOND CAUSE OF ACTION
### Conversion

28.    Claimant incorporates the above paragraphs as though fully set forth herein.

29.    Ms. Burns deposited her funds into the CMA-607 account for the express purpose of having Mr. Rowlands use his position with Respondent and his experience as a financial advisor and wealth manager to invest those funds on Ms. Burns' behalf.

30.    Instead of investing the funds on Ms. Burns' behalf, Mr. Rowlands utilized his authority on behalf of Respondent to steal the money from Ms. Burns' account and to utilize those funds his own personal benefit, and to the detriment of Ms. Burns, in a manner that concealed his activities from Ms. Burns, as described above.

31.    Mr. Rowlands' actions deprived Ms. Burns of her personal funds.

32.    Mr. Rowlands had no right to use Ms. Burns' personal funds for his own benefit. As a result of Mr. Rowland's actions, Ms. Burns has been deprived of at least $336,450.

33.    At all relevant times, Mr. Rowlands was acting on Merrill Lynch's behalf, and within the course and scope of his authority with Merrill Lynch, and thus Merrill Lynch is liable for the acts of its authorized agent.

34.    As a proximate result of Respondent's actions, Ms. Burns has suffered emotional distress.

35.    Respondent's actions were willful, fraudulent, and with malice, thus entitling Ms. Burns to an award of punitive damages.

36.    Wherefore, Claimant prays for relief as set forth below and in an amount of at least

JEPPSON & GRIFFIN, LLP
1478 Stone Point Drive, Suite 100, Roseville, CA 95661

AMENDED STATEMENT OF CLAIM

$336,450 plus interest as allowed by law, as well as emotional distress and punitive damages to be determined at arbitration.

### THIRD CAUSE OF ACTION
### Fraud and Constructive Fraud

37.     Claimant incorporates the above paragraphs as though fully set forth herein.

38.     At all relevant times, Merrill Lynch and Mr. Rowlands were financial advisors to Ms. Burns and owed Ms. Burns a fiduciary duty of undivided loyalty and to use reasonable care in the administration and investment of Ms. Burns' CMA-607 funds.

39.     Mr. Rowlands promised Ms. Burns that if she invested with Merrill Lynch, he would use his experience and expertise to invest those funds on Ms. Burns' behalf.

40.     At the time Mr. Rowlands made those promises to Ms. Burns, he knew that they were false, and intended to induce Ms. Burns' reliance on the promises.

41.     Ms. Burns reasonably relied on Mr. Rowlands' promises given his expertise and the parties close personal relationship.

42.     Merrill Lynch, through Mr. Rowlands, actively concealed Mr. Rowlands' theft and depletion of Ms. Burns' funds and the use of Ms. Burns' funds for Mr. Rowland's personal benefit.

43.     Respondent knew or should have known that Mr. Rowlands was actively concealing his transactions and misappropriating funds from CMA-607 from Ms. Burns.

44.     As a direct and proximate result of Respondent's conduct, which was also a substantial factor in causing Claimant's harm, Claimant has suffered special and general damages to be proven at trial.

45.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or agents of the Respondent who were acting at all times relevant to this Claim within the scope of their employment. Respondent is liable for the conduct of said agents and employees.

46.     Respondent's actions were willful, fraudulent, and with malice, thus entitling Ms. Burns to an award of punitive damages.

/ / /

JEPPSON & GRIFFIN, LLP
1478 Stone Point Drive, Suite 100, Roseville, CA 95661

AMENDED STATEMENT OF CLAIM

47.     Wherefore, Claimant prays for relief as set forth below and in an amount of at least $336,450 plus interest as allowed by law, as well as emotional distress and punitive damages to be determined at arbitration.

**FOURTH CAUSE OF ACTION**
**Negligence**

48.     Claimant incorporates the above paragraphs as though fully set forth herein.

49.     At all times relevant to the Claim, Merrill Lynch owed a duty of care to Ms. Burns.

50.     Merrill Lynch was negligent, and breached its duty of care to Ms. Burns, by failing to protect the funds and assets of Ms. Burns' CMA-607 and allowing Mr. Rowlands to use his position as Respondent's Senior Vice President-Wealth Management to secretly steal Ms. Burns' personal funds as alleged herein.

51.     As a direct and proximate result of Respondent's negligence, which was also a substantial factor in causing Claimant's harm, Claimant has suffered special and general damages to be proven at trial.

52.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or agents of the Respondent who were acting at all times relevant to this Complaint within the scope of their employment. Respondent is liable for the conduct of said agents and employees.

53.     Wherefore, Claimant prays for relief as set forth below and in an amount of at least $336,450 plus interest as allowed by law.

**FIFTH CAUSE OF ACTION**
**Negligent Supervision of Employee**

54.     Claimant incorporates the above paragraphs as though fully set forth herein.

55.     Merrill Lynch hired Mr. Rowlands as a Senior Vice President-Wealth Management.

56.     Mr. Rowland was and/or became unfit and/or incompetent to perform the work for which he was hired, namely the management and investment of client funds.

57.     Merrill Lynch knew or should have known that Mr. Rowland was and/or became unfit and/or incompetent to perform the work for which he was hired and that this unfitness and/or incompetence created a particular risk to others, including Ms. Burns.

JEPPSON & GRIFFIN, LLP
1478 Stone Point Drive, Suite 100, Roseville, CA 95661

7

58.    As a direct and proximate result of Respondent's negligence in hiring, supervising and/or retaining Mr. Rowlands, which was also a substantial factor in causing Claimant's harm, Claimant has suffered special and general damages to be proven at trial.

59.    Wherefore, Claimant prays for relief as set forth below in an amount of at least $336,450, plus interest as allowed by law.

### SIXTH CAUSE OF ACTION
### Respondeat Superior/Vicarious Liability

60.    Claimant incorporates the above paragraphs as though fully set forth herein.

61.    At all times material to the allegations of the Claim, Mr. Rowlands was acting as an agent of and on behalf Merrill Lynch.

62.    At all times material to the allegations of the Claim, Mr. Rowlands was acting within the scope of his agency/employment relationship with Merrill Lynch.

63.    As the principal of Mr. Rowlands, Merrill Lynch is liable for Mr. Rowlands'

64.    wrongful conduct and actions, which was a substantial factor in causing Plaintiff's damages.

65.    Wherefore, Claimant prays for relief as set forth below in an amount of at least $336,450, plus interest as allowed by law, as well as emotional distress damages, punitive damages, and attorneys' fees as allowed by law.

### PRAYER

Based on the foregoing, Claimant prays for:

1.    General and consequential damages in a minimum amount of $336,450 and/or according to proof;

2.    Emotional distress damages according to proof;

3.    Punitive damages;

4.    Pre-judgment interest;

5.    Attorney's fees as permitted by contract and/or law;

6.    Costs of the suit incurred herein; and

/ / /

JEPPSON & GRIFFIN, LLP
1478 Stone Point Drive, Suite 100, Roseville, CA 95661

AMENDED STATEMENT OF CLAIM

7.    For such other relief that the Arbitrator deems just and proper.

Dated:  May 19, 2021                              JEPPSON & GRIFFIN, LLP

TORY E. GRIFFIN
MARC C. GUÈDENET
Attorneys for Claimant Laura Burns

AMENDED STATEMENT OF CLAIM

JEPPSON & GRIFFIN, LLP
1478 Stone Point Drive, Suite 100, Roseville, CA 95661